UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| SEASPAN DEVELOPMENT | ) | (Bankruptcy Court Cases |
| CORPORATION AND HANK'S | ) | No. 04-21339 and 04-21340) |
| DOCKS, INC., d/b/a/ MALLARD | ) | Judge Greer |
| COVE MARINA, | ) | |
|     DEBTOR | ) | |
| | ) | |
| | ) | |
| INTERIM CAPITAL, LLC, | ) | |
|     APPELLANT | ) | |
| | ) | |
| v. | ) | NO. 2:05-CV-315 |
| | ) | |
| HANK'S DOCK, INC., AND SEASPAN | ) | |
| DEVELOPMENT CORPORATION, | ) | |
|     APPELLEE | ) | |

MEMORANDUM OPINION

In April 2004, Hank's Dock, Inc., [Hank's Dock] and Seaspan Development Corporation [Seaspan] filed for Chapter 11 bankruptcy protection. [Record on Appeal No. 1; No. 2] [hereinafter "RA ___"]. In November 2004, the debtors filed their first amended joint plan of reorganization. [RA 9] [hereinafter "Plan"]. In December 2004, Interim Capital, LLC, [Interim], one of the debtors' three secured creditors, filed its objections to the Plan, claiming the Plan violated various subparts of 11 U.S.C. § 1129. [RA 13]. Following a hearing in May 2005, the

bankruptcy court overruled Interim's objections and confirmed the debtors' Plan. [RA 24].  On May 20, 2005, Interim filed a notice of appeal of the bankruptcy court's decision with this court.  [RA 25].  Presently before this court is Interim's appeal.  Because this court finds no error in the bankruptcy's court decision, that decision is affirmed.        The circumstances surrounding this case were borne out of a January 1998 snow storm that blanketed Carter County, Tennessee.  [RA 8, p. 3].  Hank's Dock, the principal offices of which are located in Butler, Carter County, Tennessee, operates a marina and floating store that was substantially damaged in the snowstorm.  [*Id.*].  Seaspan is a Tennessee corporation whose principal offices are also located in Butler.  [*Id.*, p. 1].  Seaspan rents cabins and owns and operates a campground adjacent to Hank's Dock.[1]  [*Id.*].  In April 1998, Hank's Dock obtained a disaster relief loan from the United States Small Business Administration [hereinafter "SBA note"] for up to $876,600.00.  [RA 7, p. 3; RA 8, p. 4].  In August 2002, Capital Crossing Bank [Capital] purchased the SBA note. [RA 7, p. 4; RA 8, p. 5, fn. 2].  And, in March 2004, Interim became a secured creditor of the debtors when it purchased the SBA note from Capital.  [RA 7, pp. 5-6; RA 8, p. 5, fn. 3].  Interim's claim is $822,546.60.  [RA 7, p. 1; RA 24, p. 41].

---

[1] A component of the confirmed bankruptcy plan was that Seaspan would merge into Hank's Dock. [RA 24, p.39].  As a result, Hank's Dock is the only surviving entity following confirmation and the subsequent merger.

Interim raises two issues on appeal. First, it claims the bankruptcy judge erred in setting in the Plan the interest rate on Interim's claim at 4% per year over 24 years. Instead, Interim asks this court to increase its interest rate to the rate suggested by its witness, Bob Bryant: 9.69% per year. [RA 22 p. 174]. And, second, Interim contends the bankruptcy judge erred in finding that the debtors' Plan did not unfairly discriminate against Interim. Interim argues that it was unfairly discriminated against because the Plan provides higher rates of interest and more favorable repayment terms to the debtors' two other secured creditors.

On appeal, findings of fact by the bankruptcy court will not be set aside by this court unless clearly erroneous. Fed. R. Bankr. P. 8013. This court reviews the bankruptcy court's conclusions of law *de novo*. *In re Morehead*, 249 F.3d 445, 447 (6th Cir. 2001).

Interim first complains that the bankruptcy court set the Plan interest rate on its claim at 4% per year to be paid over 24 years. As stated in the confirmed Plan:

> The Interim Capital Restructured Debt will: (a) bear interest at a rate of four percent (4%) per annum, and (b) be payable in (i) payments of $2,700 each commencing on the 15th day of the month following the Effective Date[2] and on the 15th day of each month thereafter through

---

[2] The "Effective Date" has been defined as "the date fixed for the Plan to be effective following the Confirmation Date." [RA 24, p. 36]. The "Confirmation Date" "means the date of entry of an order of the Court confirming the Plan." [*Id.*, p. 35].

August 15, 2007, and (ii) 287 equal installments of principal and interest in the amount computed on the then outstanding principal balance commencing on September 15, 2007 through July 15, 2030, and (iii) a 288th installment of all remaining principal and interest due on August 15, 2031. [RA 24, p. 42].

According to the bankruptcy court, the "most appropriate [interest] rate" to be applied by bankruptcy courts "is the current market rate for similar loans at the time the new loan is made," language similar to the holding of *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427, 431 (6th Cir. 1982). [RA 22, pp. 243-44]. The court then noted that it had no evidence before it of "what the current rate of interest is for similar . . . disaster relief loans." [*Id.*, p. 244]. Instead, only evidence before the court was of the current contract loan interest rate of 4%. [*Id.*]. The court also ruled, in the alternative, that *In re Colgrove (Cardinal Federal Savings and Loan Association v. Colegrove)*, 771 F.2d 119 (6th Cir. 1985), dictated a result that "the market rate for an oversecured loan is limited to a cap of the contract rate, which in this case is four percent. To hold otherwise would give the secured creditor a windfall, to the detriment of the debtor." [*Id.*].

Pursuant to 11 U.S.C. § 506 (b), an oversecured creditor[3] has the right:

[t]o the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there

---

[3] Interim's claim in this case is $822,546.60. [RA 7, p. 1, RA 24, p. 41]. Land appraiser Matthew Tumlin, a witness for Interim Capital, valued the marina at $1,326,000.00. [RA 22, p. 148]. Thus, Interim is oversecured by about $503,000.

> shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs or charges provided for under the agreement under which such claim arose.

Neither the statute itself nor the United States Supreme Court has directly addressed how the rate of interest should be determined in a Chapter 11 bankruptcy case. *In re American Homepatient, Inc.*, 420 F.3d 559 (6th Cir. 2005), and *Till v. SCS Credit Corporation*, 541 U.S. 465 (2004), are instructive, however, *American Homepatient* dictates that a bankruptcy court deciding upon a interest rate in a Chapter 11 case should apply "the market rate" of interest "where there exists an efficient market." 420 F.3d at 568. And, when "no efficient market exists for a Chapter 11 debtor, then the bankruptcy court should employ the formula approach endorsed by the *Till* plurality." *Id*. In *Till*, the United States Supreme Court held that the formula approach–which requires the adjustment of the prime national interest rate for the risk of nonpayment–was the appropriate method for determining the adequate interest rate on a Chapter 13 cram down loan. 541 U.S. at 479-80.

Although *American Homepatient* was decided almost three months after the bankruptcy court's decision in this case, the bankruptcy court's rationale closely mirrors the framework set out by the Sixth Circuit. The bankruptcy court first stated that the interest rate should be "the current market rate for similar loans at

the time the new loan is made," similar to the *American Homepatient* court's holding that "the market rate should be applied in Chapter 11 cases." 420 F.3d at 568. [RA 22, pp. 243-44]. The bankruptcy court then noted that Interim had the burden of proof to provide evidence of the market rate for disaster loans, pursuant to *Till*. [RA 22, p. 244]. And, Interim had not satisfied that burden as the only expert who testified regarding market rates "indicated that he had never done a disaster relief loan or never been involved in a disaster relief loan although he did say that it was a favored interest rate." [*Id*.]. The only evidence, then, the bankruptcy court could rely upon to determine the market rate for disaster loans was the contract rate of 4%. [*Id*.]. Because the approach of the bankruptcy court shadowed the approach dictated by *American Homepatient*, this court affirms the 4% interest rate.

Interim's second contention is that the bankruptcy judge erred in finding that the debtors' Plan did not unfairly discriminate against Interim. Interim argues that it was unfairly discriminated against because the Plan provides higher rates of interest and more favorable repayment terms to the debtors' two other secured creditors, Frank and Beth Petersilie [hereinafter "the Petersilies"] and Citizens Bank [hereinafter "Citizens"]. [RA 24, pp. 41-45].

Pursuant to 11 U.S.C. § 1129 (b)(1), a plan of reorganization can be

confirmed even if an impaired class objects so long as the plan does not discriminate unfairly. Different courts in this circuit have used various rubrics for analyzing whether discrimination is unfair.[4] But,

> "[r]egardless of the particular test to which one ascribes, one thing is clear: at a minimum, there must be a rational or legitimate basis for the discrimination and the discrimination must be necessary for the reorganization . . . . Without either, it is impossible for the disparate treatment to be considered fair." *In re Crosscreek Apartments, LTD.*, 213 B.R. 521, 537 (Bankr. E.D. Tenn. 1997).

This court finds the bankruptcy court was correct in ruling that the debtors' Plan did not unfairly discriminate against Interim. To begin, as noted by the bankruptcy court, there was "a reasonable basis for the discrimination" for the different interest rates. [RA 22, p. 242]. First, the court noted that the contract rate between Interim and the debtors was for 4%. [*Id*.]. Second, the court stated that the original rate of the Petersilies was 8% and reduced to 5% with the Plan. [*Id*.]. Finally, the court noted that Citizens originally had an 11% interest rate, and the rate is decreased to 5% with the Plan. [*Id*.]. The most rational reason for the 4% rate of interest assigned to Interim on the SBA note by the Plan was that 4% was the actual interest rate on the contract between Interim and the debtors. [RA 7, p.

---

[4] See *In re Snyders Drug Stores*, 307 B.R. 889, 895 (Bankr. N.D. Ohio 2004) and *In re Graphic Communications, Inc.*, 200 B.R. 143, 148 (Bankr. E.D. Mich. 1996).

3]. It is also rational that the interest rates set forth in the Plan for both the Petersilies and Citizens are different from and higher than Interim's given that their original interest rates were different and higher. Consequently, although the Petersilies and Citizens will receive under the Plan a higher interest rate than Interim, both are receiving a lower interest rate than the one for which they originally contracted.

Second, this discrimination was necessary for the successful reorganization of the debtors. According to the bankruptcy court, "the projections indicate that the debtors [*sic*] numbers are very close. The debtor is going to need almost every penny that it generates to pay the principal on these debts. It would severely hamper the reorganization efforts of this debtor if it had to pay a greater interest rate than the four percent." [RA 22, pp. 242-43]. As noted above, this court cannot set aside the findings of fact made by the bankruptcy court unless they are clearly erroneous. Fed. R. Bankr. P. 8013. Paul Bound, co-owner of Hank's Dock and Seaspan Corporation, testified at the May 2005 confirmation hearing regarding his income projections for Hank's Dock in the years 2005 through 2008 and termed them very reasonable and attainable for the company and "in fact conservative." [RA 22. p. 108]. Mr. Bounds projected the company would net a profit of $64,923 in 2005, $85,728 in 2006, $93,748 in 2007, and $80,548 in 2008.

8

[RA 21, Ex. 18]. If the payment on the Interim debt was increased to the almost 10% interest it requests, the debtors would make a negative net profit in eight of the 12 months of 2005; seven of the 12 months of 2006; seven of the 12 months of 2007, and seven of the 12 months of 2008. With the foregoing evidence, this court cannot find the bankruptcy court's findings of fact regarding the necessity of the Plan interest rate discrimination to be clearly erroneous.

After careful consideration of the entire record of proceedings related to this case and for the reasons stated above, Interim's appeal is denied, and this action will be dismissed.

An appropriate order will follow.


ENTER:

s/J. RONNIE GREER  
UNITED STATES DISTRICT JUDGE